1

2

3

4

5

6

7

8

9               UNITED STATES DISTRICT COURT

10              CENTRAL DISTRICT OF CALIFORNIA

11

12  ROSEVILLE FULLERTON BURTON          CASE NO. 8:14-cv-1954-JLS-JCGx
    HOLDINGS, LLC

13                                      **ORDER GRANTING DEFENDANTS'**
                                        **MOTIONS FOR SUMMARY**
14           Plaintiff,                 **JUDGMENT (Docs. 159, 161, 162)**

15       vs.

16

17  SOCAL WHEELS, INC.; MICHAEL
    YABLONKA; CHRISTOPHE GRANGER;
18  ROBERT CULLEN; JASON SIU; and
    DONNY MAK
19

20           Defendants.

21

22

23

24

25

26

27

28

1

## I.     INTRODUCTION

Before the Court are Motions for Summary Judgment by Defendants SoCal Wheels, Inc., Christophe Granger, Michael Yablonka, Donny Mak, and Jason Siu.  (SoCal Mot., Doc. 159; Granger & Yablonka Mot., Doc. 161; Mak & Siu Mot., Doc. 162.)  Plaintiff Roseville Fullerton Burton Holdings, LLC opposes the Motions and Defendants replied.  (SoCal Opp., Doc. 177; Granger & Yablonka Opp., Doc. 175; Mak & Siu Opp., Doc. 176; SoCal Reply, Doc. 182; Granger & Yablonka Reply, Doc. 183.)  Having taken the matter under submission and considered the parties' briefs, the Court GRANTS Defendants' Motions.

## II.     BACKGROUND

### A.     Wheel Warehouse and SoCal Wheels

#### 1.     Origin and Growth of "Wheel Warehouse"

Robert Cullen began selling wheels and tires in Anaheim, CA under the name "Wheel Warehouse" in 1979.  (SGI ¶¶ 3, 9–12, 55, 57, Doc. 177-1.)  Over time, Wheel Warehouse became well-known as a pioneer in the automotive aftermarket industry.  (*Id.* ¶ 41.)  The company was written about and mentioned in print media and industry publications, and wheel and tire retailers and manufacturers travelled to Anaheim to "see how it is done."  (*Id.* ¶¶ 28–29, 41, 44.)  In the course of its business, Wheel Warehouse advertised on TV, radio, and print media, including newspapers and magazines.  (*Id.* ¶ 18.)  In addition, the company advertised in directories, through direct mail and flyers, by distributing catalogs, by sponsoring a motorsports team, and by participating in automotive events.  (*Id.* ¶¶ 22–25, 27.)

On February 20, 1996, Wheel Warehouse registered the domain name, www.wheelwarehouse.com.  (*Id.* ¶ 13.)  Wheel Warehouse then created a website at www.wheelwarehouse.com where buyers could browse Wheel Warehouse's inventory and call in their orders to the store.  (*Id.* ¶ 14.)  Upon calling in, trained salesmen would

confirm the size and fitment necessary for the use of particular wheels and tires for a particular vehicle. (*Id.*)   Customers could purchase from Wheel Warehouse in the following ways: by calling Wheel Warehouse; by making a product selection on its website which would be followed by a telephone conference with a salesman; by sending an e-mail inquiry; or by walking into the store. (*Id.* ¶ 71.)

By the 1990s, Wheel Warehouse had a 25,000 square foot facility and 43 employees. (*Id.* ¶ 47.) From at least 1995 until 2015, Wheel Warehouse sold wheels and tires to customers in Orange County, to customers from other parts of California, and to out-of-state customers. (*Id.* ¶ 70.) From 1995 to 2003, Wheel Warehouse averaged approximately $10 million per year in sales. (*Id.* ¶ 72.)

### 2.   Purchase of "Wheel Warehouse"

SoCal Wheels, Inc. was formed on November 3, 2005. (*Id.* ¶ 48.) Christophe Granger has been the President of SoCal Wheels since its formation and was previously a manager at Wheel Warehouse. (*Id.* ¶¶ 49–50.) Michael Yablonka is the Vice President and General Manager of SoCal Wheels. (*Id.* ¶ 363.) In early 2011, SoCal Wheels purchased Wheel Warehouse's assets, including Wheel Warehouse's equipment, inventory, and website. (*Id.* ¶¶ 51–53.) Afterwards, SoCal Wheels continued advertising and using the Wheel Warehouse brand and website, and continued selling wheels and tires as Wheel Warehouse at the same location Wheel Warehouse had occupied since its founding. (*Id.* ¶¶ 56–57, 59–61, 64–65.)

Following the purchase of Wheel Warehouse, SoCal Wheels took steps to expand its online presence. In 2011, Wheel Warehouse registered the domain name, www.wheelwarehouseonline.com. (*Id.* ¶ 16.) SoCal Wheels retained Donny Mak and Jason Siu to create and maintain www.socalwheels.com and to update and maintain www.wheelwarehouse.com. (Mak & Siu SGI ¶¶ 1–2, Doc. 176-1.) Although Mak and Siu never had any discussions about Discounted Wheel Warehouse, (*id.* ¶ 4), SoCal Wheels had discussions with Siu regarding putting some effort into increasing

www.wheelwarehouse.com's search rankings, (SGI ¶ 254.)  SoCal Wheels also decided to

create microsites to increase the number of hits to its Wheel Warehouse websites and to

bring in additional business.  (*Id.* ¶ 234.)  The domain names of the microsites each had the

identical naming format: www.discount[ManufacturerBrand]wheels.com.  (*Id.* ¶ 235.)

**B.** **Discounted Wheel Warehouse and Roseville**

    **1.** **Origins and Growth of "Discounted Wheel Warehouse"**

On October 14, 2002, Quality Auto Care Centers, Inc. registered the domain name,

www.discountedwheelwarehouse.com.  (SGI ¶ 86.)  The name "Discounted Wheel

Warehouse" was first used by Quality Auto Care in 2003.  (*Id.* ¶ 83.)  At the time the name

was first used, Quality Auto Care was located in Roseville, CA.  (*Id.* ¶ 84.)  Quality Auto

Care then moved to Sacramento, CA, (*id.* ¶ 85), and at some point in 2004, operations for

Discounted Wheel Warehouse moved to Cerritos, CA, (*id.* ¶ 262.)  Quality Auto Care

dissolved on December 2, 2004.  (*Id.* ¶ 87.)  Upon its dissolution, Quality Auto Care

transferred its business assets and www.discountedwheelwarehouse.com to USA Wheel

and Tire Outlet #2, Inc., a business owned and managed by Naeem Niamat and Dean

Riley.  (*Id.* ¶¶ 88–90, 123–25.)  Although originally located in Cerritos, USA Wheel and

Tire Outlet #2 moved to Fullerton, CA in early 2007.  (*Id.* ¶¶ 99, 258.)  Niamat came to

know about Wheel Warehouse at least as early as 2007 when this move occurred.  (*Id.* ¶¶

258–59.)

After the transfer of assets from Quality Auto Care, USA Wheel and Tire Outlet #2

engaged in the sale of wheels and tires using the name "Discounted Wheel Warehouse"

and the website, www.discountedwheelwarehouse.com.  (*Id.* ¶¶ 91, 106.)  USA Wheel and

Tire Outlet #2 did not sponsor, participate in, or advertise or display its products at

industry events.  (*Id.* ¶¶ 108–10.)  Rather, the company advertised mostly on the Internet.

(*Id.* ¶ 117.)  Part of USA Wheel and Tire Outlet #2's online marketing efforts included

attempting to "rank" higher on search engines like Google.com.  (*Id.* ¶ 118.)  By 2006,

1  when it submitted its application for trademark registration, www.discountedwheel

2  warehouse.com was the first rank result when people searched for "Discounted Wheel

3  Warehouse," and the website has always ranked first since.  (*Id.* ¶¶ 128–29.)

4          **2.**      **Trademark Registration**

5       USA Wheel and Tire Outlet #2 applied to the United States Patent and Trademark

6  Office ("USPTO") to register the trademark "Discounted Wheel Warehouse" on July 17,

7  2006.  (*Id.* ¶ 130.)  In conjunction with its application, USA Wheel and Tire Outlet #2's

8  legal counsel declared that to the best of its knowledge and belief, no other entity had the

9  right to use the mark in commerce.  (*Id.* ¶ 131.)  The USPTO denied registration by non-

10  final action on three different occasions: December 18, 2006; June 11, 2007; and January

11  7, 2008.  (*Id.* ¶ 132.)  The USPTO initially refused to register the mark because it was

12  merely descriptive and did not sufficiently identify the nature of the applicant's services.

13  (*Id.* ¶ 133.)  In response, USA Wheel and Tire Outlet #2 explained that the mark had

14  gained secondary meaning due to its advertising and sales and amended the recitation of

15  services to be more specific.  (*Id.* ¶¶ 134–35, 137–42.)  The USPTO again declined to

16  register the mark on the basis that despite demonstrating its advertising and sales, the

17  applicant had not yet presented evidence of its distinctiveness.  (*Id.* ¶ 144.)  USA Wheel

18  and Tire Outlet #2 sent a reply asserting that the mark had become distinctive and acquired

19  secondary meaning by virtue of its extensive advertising, extensive sales, and web hits.

20  (*Id.* ¶¶ 145–47.)  The USPTO then requested that USA Wheel and Tire Outlet #2 verify

21  that the mark had become distinctive and disclaim the exclusive right to use "WHEEL"

22  apart from the mark.  (*Id.* ¶ 148.)  USA Wheel and Tire Outlet #2 complied with these

23  requests, and registration was granted.  (*Id.* ¶¶ 149–50, 152.)  The "Discounted Wheel

24  Warehouse" trademark was published in the principal register on June 24, 2008, and

25  registered on September 9, 2008.  (*Id.* ¶ 153.)  The trademark registration for "Discounted

26  Wheel Warehouse" states the date of first use as November 1, 2003.  (*Id.* ¶ 154.)  Five

27  years later, the mark was granted incontestability on November 22, 2013.  (*Id.* ¶ 156.)

28

Before its eventual dissolution, USA Wheel and Tire Outlet #2 owned the registered trademark, "Discounted Wheel Warehouse." (*Id.* ¶ 165.)

### 3.   Transfer of the Trademark to Roseville

USA Wheel and Tire Outlet #2 dissolved on December 4, 2013. (*Id.* ¶ 164.) To take its place, The Wheel and Tire Club, Inc. was established on December 12, 2013 as USA Wheel and Tire Outlet #2's successor-in-interest. (*Id.* ¶¶ 159–60.) Like its predecessor, The Wheel and Tire Club is owned by Niamat and Riley, and Niamat is the controlling shareholder and officer of the business. (*Id.* ¶¶ 161, 176.) Although The Wheel and Tire Club acquired some of USA Wheel and Tire Outlet #2's business assets, including all of the capital equipment necessary to operate the business of selling wheels and tires, the "Discounted Wheel Warehouse" trademark was assigned to a different entity, Roseville Fullerton Burton Holdings, LLC. (*Id.* ¶¶ 101, 166, 168.) Roseville did not pay any money or other consideration for the transfer of the trademark. (*Id.* ¶ 167.)

Nevertheless, The Wheel and Tire Club operates www.discountedwheelwarehouse .com and processes all orders made through that website as its predecessor had done. (*Id.* ¶¶ 160, 169.) The Wheel and Tire Club uses the mark "Discounted Wheel Warehouse" and licenses it from Roseville. (*Id.* ¶ 102, 175.) The Wheel and Tire Club does not have any written trademark license agreement with Roseville for the mark. (*Id.* ¶ 176.) Rather than pay royalties, The Wheel and Tire Club pays for the use of the trademark through "inflated rent" on its lease with Roseville for the Fullerton premises. (*Id.* ¶¶ 174, 179–80.) No part of The Wheel and Tire Club is owned by Roseville, and Roseville is not the parent company of The Wheel and Tire Club. (*Id.* ¶¶ 162–63.) However, Niamat is the principal and managing member of Roseville. (*See id.* ¶¶ 176, 258.)

### C.   Procedural History

Roseville filed its Complaint against SoCal Wheels on December 9, 2014. (Compl., Doc. 1.) On December 18, 2015, Roseville filed a First Amended Complaint adding Icon

1  Internet Media, Inc., Michael Yablonka, Christophe Granger, Robert Cullen, Jason Siu,

2  and Donny Mak as defendants.  (FAC, Doc. 98.)  The FAC stated the following eight

3  claims: (1) federal trademark infringement under the Lanham Act; (2) false designation of

4  origin and false description under the Lanham Act; (3) cyberpiracy under 15 U.S.C §

5  1125(d); (4) trademark infringement under California law; (5) unfair competition under

6  California law; (6) intentional interference with prospective economic advantage; (7)

7  contributory trademark infringement; and (8) common law passing off and disparagement.

8  (*Id.* ¶¶ 74–116.)  The first four claims were against SoCal Wheels, Cullen, Yablonka, and

9  Granger.  (*Id.* ¶¶ 74–95.)  The fifth and eighth claims were against SoCal Wheels alone.

10  (*Id.* ¶¶ 96–98, 111–16.)  The sixth claim was against all Defendants.  (*Id.* ¶¶ 99–105.)  The

11  seventh claim was against all Defendants except SoCal Wheels.  (*Id.* ¶¶ 106–10.)

12          On May 20, 2016, the Court dismissed the California trademark infringement and

13  unfair competition claims with respect to SoCal Wheels, and dismissed the intentional

14  interference claim with respect to SoCal Wheels, Granger, Yablonka, and Siu.  (Dismissal

15  Order, Doc. 141.)  Roseville and Cullen reached a settlement on September 6, 2016.

16  (Notice of Settlement, Doc. 187.)  SoCal Wheels now moves for summary judgment on all

17  of Roseville's claims against it.  (SoCal Mot. at 1.)  Granger, Yablonka, Mak, and Siu join

18  in SoCal Wheels' Motion.  (Granger & Yablonka Mot. at 1; Mak & Siu Mot. at 1.)

19  Granger, Yablonka, Mak, and Siu also move for summary judgment on claims not

20  included in SoCal Wheel's Motion.  (Granger & Yablonka Mot. at 1; Mak & Siu Mot. at

21  1.)

22

23  **III.   LEGAL STANDARD**

24          In deciding a motion for summary judgment, the Court must view the evidence in

25  the light most favorable to the non-moving party and draw all justifiable inferences in that

26  party's favor.  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986).  Summary

27  judgment is proper "if the [moving party] shows that there is no genuine dispute as to any

28

material fact and the [moving party] is entitled to judgment as a matter of law."  Fed. R.
Civ. P. 56.  A factual issue is "genuine" when there is sufficient evidence such that a
reasonable trier of fact could resolve the issue in the non-movant's favor, and an issue is
"material" when its resolution might affect the outcome of the suit under the governing
law.  *Anderson*, 477 U.S. at 248.

The moving party bears the initial burden of demonstrating the absence of a genuine
issue of fact.  *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).  "Once the moving party
carries its initial burden, the adverse party 'may not rest upon the mere allegations or
denials of the adverse party's pleading,' but must provide affidavits or other sources of
evidence that 'set forth specific facts showing that there is a genuine issue for trial.'"
*Devereaux v. Abbey*, 263 F.3d 1070, 1076 (9th Cir. 2001) (quoting Fed. R. Civ. P. 56(e)).

In deciding a motion for summary judgment, the court must view the evidence in
the light most favorable to the non-moving party and must resolve all ambiguities and
draw all reasonable inferences against the movant.  *See Anderson*, 477 U.S. at 255.
However, "credibility determinations, the weighing of evidence, and the drawing of
legitimate inferences from the facts are jury functions, not those of a judge."  *Acosta v.
City of Costa Mesa*, 718 F.3d 800, 828 (9th Cir. 2013) (quoting *Reeves v. Sanderson
Plumbing Prods., Inc.*, 530 U.S. 133, 150 (2000)).  The role of the court is not to resolve
disputed issues of fact but to assess whether there are any factual issues to be tried.

## IV.   **DISCUSSION**

### A.   **Federal Trademark Infringement and False Designation of Origin and
False Description**

Section 32 of the Lanham Act prohibits the use of a registered mark in commerce
without the trademark owner's consent.  *See* 15 U.S.C. § 1114.  Section 43(a) of the
Lanham Act prohibits the use in commerce of "any word, term, name, symbol, or device,
or any combination thereof, or any false designation of origin, false or misleading

description of fact, or false or misleading representation of fact" which is likely to cause confusion, cause mistake, or deceive another. *See* 15 U.S.C. § 1125(a). Whereas Section 32 provides protection only to registered marks, Section 43(a) protects against infringement of unregistered marks and a wider array of practices in addition to infringement of registered marks. *See Brookfield Commc'ns, Inc. v. West Coast Entm't Corp.*, 174 F.3d 1036, 1046 n.8 (9th Cir. 1999). Despite these differences, the analysis under the two provisions is often identical. *See id.* To prevail on a claim of trademark infringement under the Lanham Act, a party must prove: (1) that it has a protectable ownership interest in the mark; and (2) that the defendant's use of the mark is likely to cause consumer confusion. *Network Automation, Inc. v. Advanced Systems Concepts, Inc.*, 638 F.3d 1137, 1144 (9th Cir. 2011). However, Defendants make two threshold arguments in support of summary judgment: (1) Roseville's trademark is invalid because it was acquired through an improper assignment-in-gross; and (2) laches bars Roseville's trademark infringement claims. (SoCal Mem. at 4, Doc. 159-1.)

### 1. Assignment-in-Gross

First, Defendants argue that there is no valid, protectable trademark because the registered mark was invalidated by an improper assignment-in-gross. (SoCal Mem. at 4.) Specifically, Defendants argue that Roseville's registered trademark was invalidated when it was transferred from USA Wheel and Tire Outlet #2. (*Id.* at 5.) Assignments of trademarks in gross are traditionally invalid. *E. & J. Gallo Winery v. Gallo Cattle Co.*, 967 F.2d 1280, 1289 (9th Cir. 1992). However, it is unnecessary for the entire business or its tangible assets to be transferred with the trademark to make the transfer valid; a transfer of goodwill is enough. *Id.*; 15 U.S.C. § 1060 ("A registered mark for which an application to register has been filed shall be assignable with the good will of the business in which the mark is used, or with that part of the good will of the business connected with the use of and symbolized by the mark."). "The purpose behind requiring that goodwill accompany the assigned mark is to maintain the continuity of the product or service symbolized by the

mark and thereby avoid deceiving or confusing consumers." *Gallo Winery*, 967 F.2d at
1289 (citation omitted).

Courts within and without the Ninth Circuit have recognized the difficulty in
determining whether a transfer of goodwill has occurred in cases of trademark assignment.
*See, e.g.*, *Berni v. Int'l Gourmet Restaurants of America, Inc.*, 838 F.2d 642, 646 (2d Cir.
1988) ("Of course the question whether a mark has been severed from its goodwill may
not always be an easy one."); *Money Store v. Harriscorp Finance, Inc.*, 689 F.2d 666, 676
(7th Cir. 1982) ("It is admittedly difficult to determine when a transfer of goodwill has
occurred."); *Brady v. Grendene USA, Inc.*, No. 3:12-cv-0604-GPC-KSC, 2015 WL
3539702, at *7 (S.D. Cal. Jun. 3, 2015) ("The Court notes that the caselaw surrounding
whether an assignment is an invalid assignment in gross is not a model of consistency.").
However, a common test that arises from these cases is whether the transfer "disrupt[s]
continuity of the products or services associated with a given mark." *See Gallo Winery*,
967 F.2d at 1290; *accord Defiance Button Machine Co. v. C & C Metal Products Corp.*,
759 F.2d 1053, 1059 (2d Cir. 1985); *Visa, U.S.A., Inc. v. Birmingham Trust Nat'l Bank*,
696 F.2d 1371, 1376–77 (Fed. Cir. 1982); *Money Store*, 689 F.2d at 678; *Burgess v.
Gilman*, 475 F. Supp. 2d 1051, 1059 (D. Nev. 2007); *R & R Partners, Inc. v. Tovar*, 447 F.
Supp. 2d 1141, 1149 (D. Nev. 2006); *Glow Industries, Inc. v. Lopez*, 273 F. Supp. 2d 1095,
1108 (C.D. Cal. 2003); *American Sleek Craft, Inc. v. Neschler*, 131 B.R. 991, 1000 (D.
Ariz. 1991); *see also* Rest. 3d Unfair Competition § 34.  Where a license-back agreement
is involved, there is an additional test of whether the licensor "provide[s] for adequate
control . . . over the quality of goods or services produced under the mark." *See*, *Gallo
Winery*, 967 F.2d at 1290; *accord Visa, U.S.A.*, 696 F.2d at 1377; *Glow Industries*, 273 F.
Supp. 2d at 1110.  Whether there is continuity and whether the licensor has retained
adequate control are evaluated on a case-by-case basis.  *See PepsiCo, Inc. v. Grapette Co.*,
416 F.2d 285, 289 (8th Cir. 1969); *Glow Industries*, 273 F. Supp. 2d at 1108; *Brady*, 2015
WL 3539702, at *7.  Although the ordinary assignment/license-back agreement involves

1 two parties, a Ninth Circuit panel has stated that the inquiry "should functionally be the

2 same" where the agreement involves three parties instead of two. *Parkinson v. Robanda*

3 *Int'l, Inc.*, 641 Fed. Appx. 745, 747 (9th Cir. 2016).

4      According to the undisputed facts, upon USA Wheel and Tire Outlet #2's

5 dissolution, some of its assets, including all the capital equipment necessary to operate the

6 business of selling wheels and tires, were transferred to The Wheel and Tire Club, its

7 successor-in-interest.  (SGI ¶¶ 101, 160, 168.)  The Wheel and Tire Club then continued

8 selling wheels and tires through www.discountedwheelwarehouse.com as its predecessor

9 had done.  (*Id.* ¶¶ 160, 169.)  However, the trademark was transferred to Roseville, and

10 Roseville then licensed the mark to The Wheel and Tire Club.  (*Id.* ¶¶ 102, 165–66, 175.)

11 All of the entities involved in these transactions were created, owned, and actively

12 managed by Niamat.  (*See id.* ¶¶ 123, 125, 161, 176, 265.)

13      Based on these facts, the Court concludes there was a valid assignment of the

14 trademark.  There is no indication that any disruption occurred in the provision of wheels

15 and tires through www.discountedwheelwarehouse.com after USA Wheel and Tire Outlet

16 #2 transferred its assets.  Rather, The Wheel and Tire Club immediately continued USA

17 Wheel and Tire Outlet #2's business.  Roseville, as the licensor, could adequately control

18 the quality of goods and services provided by The Wheel and Tire Club because both

19 entities were under common ownership and management.  Moreover, the common

20 ownership and management of all these entities ensured that information sufficient "to

21 continue the lure of business" had passed along with the trademark.  *See Gallo Winery*,

22 957 F.2d at 1289; *Parkinson*, 641 Fed. Appx. at 747.  Accordingly, the trademark

23 assignment was valid and was not an improper assignment-in-gross.

24      **2.**     **Laches**

25      Defendants also argue that Roseville's claims of infringement and false designation

26 are barred by laches.  (SoCal Mem. at 7.)  Laches is an equitable time limitation on a

27 party's right to bring suit and is a valid defense to Lanham Act claims.  *Jarrow Formulas,*

28

1   *Inc. v. Nutrition Now, Inc.*, 304 F.3d 829, 835 (9th Cir. 2002). The party asserting laches

2   must show that it suffered prejudice as a result of the plaintiff's unreasonable delay in

3   filing suit. *Id.* While laches and the statute of limitations are distinct defenses, a laches

4   determination is made with reference to the limitations period for the analogous action at

5   law. *Id.* If the plaintiff filed suit within the analogous limitations period, the strong

6   presumption is that laches is inapplicable. *Id.* However, if suit is filed outside of the

7   period, it is presumed that laches is applicable. *Id.* at 836, 838. The presumption of laches

8   is triggered if any part of the claimed wrongful conduct occurred beyond the limitations

9   period. *Id.* at 837. The limitations period runs from the time the plaintiff knew or should

10  have known about his claim. *Id.* at 838.

11          When a federal statute lacks a specific statute of limitations, it is generally

12  presumed that Congress intended to "borrow" the limitations period from the most closely

13  analogous action under state law. *Id.* at 836. The Lanham Act contains no explicit statute

14  of limitations. *Id.* In California, courts in the Ninth Circuit have split between applying a

15  three-year period or a four-year period. *See, e.g.*, *Karl Storz Endoscopy America, Inc. v.*

16  *Surgical Technologies, Inc.*, 285 F.3d 848, 857 (9th Cir. 2002) (applying three-year period

17  from Section 338(d) of the Code of Civil Procedure); *Jarrow*, 304 F.3d at 838 (applying

18  three-year period from Section 338(d)); *Internet Specialties West, Inc. v. Milon-DiGiorgio*

19  *Enterprises, Inc.*, 559 F.3d 985, 990 n.2 (9th Cir. 2009) (applying four-year period "from

20  California trademark infringement law"); *Fitbug Limited v. Fitbit, Inc.*, 78 F. Supp. 3d

21  1180, 1188–89 (N.D. Cal. 2015) (noting that Ninth Circuit and district courts in California

22  have "almost universally" assumed a four-year period from Sections 337 or 343 of the

23  Code of Civil Procedure, but expressing some concern over the assumption).

24          The Court concludes that under either a three-year or a four-year approach, the

25  limitations period has long since run. The mark "Discounted Wheel Warehouse" was used

26  as early as 2003 and was registered on September 9, 2008. (SGI ¶¶ 83, 153.) USA Wheel

27  and Tire Outlet #2 was the registrant and original owner of the "Discounted Wheel

28

12

Warehouse" trademark.  (*Id.* ¶¶ 150, 152, 165.)  Niamat, who was the owner and president of USA Wheel and Tire Outlet #2 and who had a direct role in registering the trademark, was aware of Wheel Warehouse and its business since 2007.  (*Id.* ¶¶ 150, 161, 258–59.)  Moreover, Wheel Warehouse was also a customer of some of Niamat's other tire distributor businesses since at least 2008.  (*Id.* ¶¶ 265–68, 270.)  Yet a lawsuit was not filed until late 2014.  Given the similarities in trade names, the proximity in location of the two businesses, and the fact that both sell wheels and tires online, the Court concludes that Niamat and USA Wheel and Tire Outlet #2 should have known of Wheel Warehouse's potential infringing use back in 2007 when they became aware of Wheel Warehouse's existence.  Therefore, there is a presumption that laches applies.  The Court now analyzes whether (1) Roseville's delay in filing suit was unreasonable, and (2) Defendants would suffer prejudice from the delay if the suit were to continue.  *See Jarrow*, 304 F.3d at 838.

### a.    Unreasonable Delay

In determining whether the delay was unreasonable, a court must balance the following six factors: (1) the strength and value of the trademark rights asserted; (2) the plaintiff's diligence in enforcing mark; (3) the harm to the senior user if relief is denied; (4) whether there is good faith ignorance by the junior user; (5) the competition between senior and junior users; and (6) the extent of harm suffered by the junior user because of the senior user's delay.  *Tillamook Country Smoker, Inc. v. Tillamook County Creamery Ass'n*, 465 F.3d 1102, 1108 (9th Cir. 2006).

### i.    First Factor: Strength and Value of the Trademark Rights Asserted

The first factor weighs in favor of Defendants.  "The strength of a mark is determined by its placement on a 'continuum of marks from "generic," afforded no protection; through "descriptive" or "suggestive," given moderate protection; to "arbitrary" or "fanciful" awarded maximum protection.'"  *Gallo Winery*, 967 F.2d 1280, 1291 (9th Cir. 1992) (citation omitted).  "A strong mark is inherently distinctive, for example, an arbitrary or fanciful mark."  *AMF Inc. v. Sleekcraft Boats*, 599 F.2d 341, 349 (9th Cir.

1979), *abrogated on other grounds by Mattel, Inc. v. Walking Mountain Productions*, 353 F.3d 792 (9th Cir. 2003).  "Descriptive or suggestive marks are relatively weak."  *Grupo Gigante SA De CV v. Dallo & Co., Inc.*, 391 F.3d 1088, 1102 (9th Cir. 2004).  The former specifically describes a "characteristic or ingredient of an article or service," while the latter "suggests, rather than describes, an ingredient, quality or characteristic."  *Nutri/System, Inc. v. Con-Stan Industries, Inc.*, 809 F.2d 601, 605 (9th Cir. 1987).  Here, Roseville's mark is descriptive or, at most, suggestive.  The term "Discounted Wheel Warehouse" describes or suggests a large selection of wheels offered for sale at a discount.  There is nothing arbitrary or fanciful about a wheel and tire business doing business under such a mark.  Roseville's mark is therefore relatively weak, and the first factor weighs in favor of Defendants.

        ii.      <u>Second Factor: Plaintiff's Diligence in Enforcing the Mark</u>

      The second factor also weighs in favor of Defendants.  As mentioned above, Niamat was aware of Wheel Warehouse and its business even before "Discounted Wheel Warehouse" became a registered trademark.  (SGI ¶¶ 153, 258–59.)  Wheel Warehouse also became a customer of Niamat's other tire distributor businesses in 2008.  (*Id.* ¶¶ 265–68, 270.)  Despite these facts and the similarities between the two businesses' trade names and lines of business, there is no indication that Niamat, USA Wheel and Tire Outlet #2, or Roseville took steps to enforce their trademark until filing the instant suit.

      Roseville seeks to explain the delay by raising the doctrine of "progressive encroachment."  (SoCal Opp. at 23.)  Under this doctrine, the trademark owner need not sue in the face of *de minimis* infringement by the junior user.  *Tillamook*, 465 F.3d at 1110.  Instead, the owner may wait until the junior user moves into direct competition, selling the same product through the same channels, and causing actual market confusion.  *Id.*  Common methods of encroachment are the junior user's expansion of its business into different regions or into different markets.  *Id.*  However, a junior user's growth of its existing business and the concomitant increase in its use of the mark do not constitute

1    progressive encroachment.  *Id.*  Roseville argues that Defendants moved into direct

2    competition in 2013 when they began making direct online sales through their websites.

3    (SoCal Opp. at 21.)  This is no justification for delay when, as here, the junior user is a

4    pioneer in the automotive aftermarket industry and averaged approximately $10 million

5    per year in sales at its high-point.  (*See* SGI ¶¶ 41, 72.)  Moreover, Defendants have had a

6    website since 1996, and customers could purchase wheels and tires by making a product

7    selection on the website (which would then be followed by a phone conference with a

8    salesman).  (*Id.* ¶¶ 14, 71.)  The distinction on which Roseville relies is that before 2013,

9    customers could not complete a purchase online because Defendants' websites did not

10   facilitate online payments.  (*See* SGI ¶ 16.)  That distinction does not describe expansion

11   into different regions or different markets; if anything, it simply indicates growth of

12   Defendants' existing business.

13              iii.    Third Factor: Harm to Roseville if Relief Is Denied

14            The third factor weighs in favor of Roseville.  As described above, the two marks at

15   issue in this case are similar in sight, sound, and meaning.  Both parties sell wheels and

16   tires online and through a physical retail location in Orange County.  There is a likelihood

17   of confusion that will diminish the value of Roseville's trademark if relief is denied.

18              iv.    Fourth Factor: Good Faith Ignorance by Defendants

19            The fourth factor weighs in favor of Defendants.  The "Wheel Warehouse" business

20   and brand has existed in Orange County since 1979.  (*See* SGI ¶¶ 1, 3–12, 51–52, 55, 57.)

21   Wheel Warehouse registered the domain name, www.wheelwarehouse.com, and created a

22   website at that URL in 1996.  (*Id.* ¶¶ 13–14.)  This conduct predates by several years the

23   registration of www.discountedwheelwarehouse.com, the use of "Discounted Wheel

24   Warehouse" as a trade name, and the registration of "Discounted Wheel Warehouse" as a

25   trademark.  (*Id.* ¶¶ 83, 86, 153.)  It cannot be said that Defendants lack good faith in

26   choosing to continue using a mark they have used for decades upon learning that a similar

27   mark is being used by a competitor.

28

v.     Fifth Factor: Competition between Senior and Junior Users

The fifth factor weighs in favor of Roseville.  Both Roseville and SoCal Wheels sell wheels and tires online and through a physical location in Orange County and have been doing so for several years.  Given the high level of competition between the parties, this factor weighs against the application of laches.  *See Grupo Gigante*, 391 F.3d at 1104.

vi.     Sixth Factor: Extent of Harm Suffered by the Junior User Because of the Senior User's Delay

Finally, the sixth factor weighs in favor of Defendants.  As mentioned above, courts in the Ninth Circuit have applied either a three-year or four-year limitations period to an assertion of laches against Lanham Act claims.  Here, it took Roseville six years after registering its trademark to bring its infringement suit.  The passage of time works to prejudice Defendants by eroding available evidence and lulling Defendants into investing time, money, and effort into building their mark's value in reliance on Roseville's inaction.

In light of the presumption that laches applies, and considering four of the six factors weigh in Defendants' favor, the Court concludes that Roseville's delay was unreasonable.

b.     *Prejudice*

Courts have recognized two chief forms of prejudice in the laches context: evidentiary prejudice and expectations-based prejudice.  *Danjaq LLC v. Sony Corp.*, 263 F.3d 942, 955 (9th Cir. 2001).  Evidentiary prejudice includes such things as lost, stale, or degraded evidence, or witnesses whose memories have faded or who have died.  *Id.* Expectations-based prejudice arises when a defendant took actions or suffered consequences that it would not have had the plaintiff promptly brought suit.  *Id.*

For evidentiary prejudice, Defendants' Statement of Undisputed Facts states that Wheel Warehouse has thrown out the majority of its records and can produce only a fraction of the whole.  (SUF ¶¶ 271–72, Doc. 159-2.)  Roseville asserts that Defendants have not suffered evidentiary prejudice in light of their production of advertisements

16

dating back to 1979.  (SoCal Opp. at 24.)  Roseville points out that most of the advertisements are from 1999 or before and reasons that the lack of more recent examples is more likely the result of reduced advertising activity rather than any prejudice.  (SGI ¶¶ 271–72.)  However, just because Defendants produced what they have does not mean that they did not discard or otherwise destroy records that they would otherwise have kept had they been sued earlier.  Even if Roseville were correct that the lack of more recent ads is a result of reduced advertising activity, it does not then follow that Wheel Warehouse did not have a practice of discarding or destroying other records.

As for expectations-based prejudice, the Statement of Undisputed Facts states that SoCal Wheels bought Wheel Warehouse with a good faith belief that Roseville would not pose a significant problem to their business operations.  (*Id.* ¶¶ 275–76.)  "Had suit about intellectual property rights been pending at the time, SoCal would not have bought the Wheel Warehouse assets."  (*Id.* ¶ 276.)  Roseville argues that Defendants' prejudice relies only on the expenses of "expanding, revamping, and advertising its website."  (SoCal Opp. at 24.)  "[I]f prejudice . . . could consist merely of expenditures in promoting the infringed name, then relief would have to be denied in practically every case of delay."  (*Id.* (quoting *Internet Specialties*, 559 F.3d at 991).)  However, this argument fails to adequately address the fact that SoCal Wheels purchased Wheel Warehouse in 2011, (SGI ¶¶ 51–53), and that a suit for trademark infringement could have been filed as early as 2007 when Niamat first learned of Wheel Warehouse's existence, (*id.* ¶¶ 258–59.)  Roseville completely sidesteps the core of Defendants' expectations-based prejudice claim, which is that SoCal Wheels would not have purchased Wheel Warehouse to begin with had a trademark suit been pending at the time.  (*Id.* ¶¶ 275–76.)  Accordingly, the Court concludes that Defendants suffered prejudice from Roseville's delay.

In light of the presumption that laches applies, and the Court's determination that Defendants have suffered prejudice from Roseville's unreasonable delay in bringing suit, the Court concludes that laches bars Roseville's claims of (1) trademark infringement and

(2) false designation of origin and false description under the Lanham Act.  Therefore, the Court GRANTS Defendants' Motions as to those claims.

### B.   Cyberpiracy

The Anti-Cybersquatting Consumer Protection Act ("ACPA") establishes civil liability for any person who, with a bad faith intent to profit from another's distinctive or famous trademark, registers, traffics in, or uses a domain name that is identical or confusingly similar to that trademark.  *See* 15 U.S.C. § 1125(d).  To be liable under Section 1125(d), a plaintiff must prove (1) the defendant registered, trafficked in, or used a domain name; (2) the domain name is identical or confusingly similar at the time of registration to a protected mark owned by the plaintiff; and (3) the defendant acted with bad faith intent to profit from that mark.  *See GoPets Ltd. v. Hise*, 657 F.3d 1024, 1030 (9th Cir. 2011); *DSPT Int'l, Inc. v. Nahum*, 624 F.3d 1213, 1218–19 (9th Cir. 2010). "Similarity of the marks is tested on three levels: sight, sound, and meaning." *Sleekcraft*, 599 F.2d at 351.  The "sight, sound, and meaning" analysis involves (1) a "subjective 'eyeball' test"; (2) examination of the marks' "[p]honetic similarity"; and (3) examining the meaning of the words used in the marks.  *Miss World (UK) Ltd. v. Mrs. America Pageants, Inc.*, 856 F.2d 1445, 1451 (9th Cir. 1988), *abrogated on other grounds by Eclipse Associates Ltd. v. Data General Corp.*, 894 F.2d 1114, 1116 n.1 (9th Cir. 1990).

According to the undisputed facts, www.wheelwarehouse.com was registered and created in 1996.  (SGI ¶¶ 13–14.)  The name "Discounted Wheel Warehouse" was first used in 2003 and was registered as a trademark in 2008.  (*Id.* ¶¶ 83, 153.)  In order to get the trademark registered, USA Wheel and Tire Outlet #2 had to disclaim the exclusive right to use "WHEEL" apart from the mark.  (*Id.* ¶ 148.)  In 2011, Wheel Warehouse registered the domain name, www.wheelwarehouseonline.com.  (*Id.* ¶ 16.)  After SoCal Wheels purchased Wheel Warehouse, it began creating microsites to increase the number of hits to its Wheel Warehouse websites.  (*Id.* ¶ 234.)  These microsites all had domain

names with the following format: www.discount[ManufacturerBrand]wheels.com.  (*Id.* ¶ 235.)  Given that www.wheelwarehouse.com was registered and created at least seven years before the "Discounted Wheel Warehouse" mark was first used, and twelve years before the mark became registered, that domain name could not have been "identical or confusingly similar" to Roseville's mark at the time of its registration.  Nor could a reasonable jury conclude that Wheel Warehouse had a bad faith intent in its registration and use of www.wheelwarehouseonline.com in light of the prior existence of www.wheelwarehouse .com and the fact that only a single word, which is not part of Roseville's trademark, was added to the domain name.

As to the microsites, the Court concludes that no reasonable jury could find the domain names of those sites to be confusingly similar to Roseville's trademark.  First, the domain names are not confusingly similar to Roseville's mark when subjected to the "eyeball" test.  Although the domain names all begin with the word "discount," none contain the word "warehouse," and "wheel" appears at the end, rather than the middle, of the domain names.  Between "discount" and "wheel" are brand names of wheel and tire companies.  This is unlike the situation in *Sleekcraft*, where the marks were "the same except for two inconspicuous letters in the middle of the first syllable."  599 F.2d at 351.

Second, the domain names are not phonetically similar to Roseville's mark.  "Sound is also important because reputation is often conveyed word-of-mouth."  *Id.*  When spoken or read aloud, the sounds of the domain names and Roseville's mark are clearly distinguishable.  Even though the words "discount" and "wheel" are present in the domain names, the different placement of "wheel" and the inclusion of the manufacturer brand names results in a sound that is different from the sound of "Discounted Wheel Warehouse."  This is unlike the situation in *Sleekcraft*, where "the two sounds can be distinguished, but the difference is only in a small part of one syllable."  *Id.* at 351–52.

Third, the meaning of the words used in the marks, although similar when analyzed in isolation, are less similar when examined as a whole.  It is true that the words "discount"

19

and "wheel" carry the same meaning in both Roseville's trademark and the microsite domain names.  However, "[c]omposite marks should be examined in their entirety, not piece by piece," *Rodeo Collection, Ltd. v. West Seventh*, 812 F.2d 1215, 1218 (9th Cir. 1987), *impliedly overruled on other grounds as recognized by Perfect 10, Inc. v. Google, Inc.*, 653 F.3d 976, 979–81 (9th Cir. 2011).   None of the microsite domain names actually contain the full term, "Discounted Wheel Warehouse."  Rather, they describe discounts as to wheels made by specific wheel manufacturers.  This is different from Roseville's trademark which describes a warehouse of wheels at, presumably, discounted prices.  The Court also notes that Roseville's predecessor specifically disclaimed the exclusive right to use the word "wheel" apart from the trademark when it obtained registration, and nowhere in the facts does Roseville show an exclusive right to use the word "discount" or a combination of the words "discount" and "wheel" apart from its registered mark.

Accordingly, the Court concludes that Roseville cannot prevail on its cyberpiracy claim as a matter of law and therefore GRANTS Defendants' Motions as to this claim.

### C.     Contributory Trademark Infringement

Liability for trademark infringement can extend beyond those who actually mislabel goods with the mark of another.  *Inwood Laboratories, Inc. v. Ives Laboratories, Inc.*, 456 U.S. 844, 853 (1982).  A party can be held liable for the infringing activities of another (1) if the party intentionally induces the other to infringe a trademark, or (2) if it continues to supply a product or service to one who it knows or has reason to know is engaging in trademark infringement.  *Id.*  For the second basis for liability, it is unnecessary that the party intend the provision of a product or service to contribute to any infringement.  *See Louis Vuitton Malletier, S.A. v. Akanoc Solutions, Inc.*, 658 F.3d 936, 943 (9th Cir. 2011).  It is sufficient if the goods or services were provided with "actual or constructive knowledge" that the users of those goods or services were engaging in trademark infringement.  *Id.*  "[W]hen measuring and weighing a fact pattern in the contributory

1    infringement context without the convenient 'product' mold . . . [a court] consider[s] the

2    extent of control exercised by the defendant over the third party's means of infringement."

3    *Lockheed Martin Corp. v. Network Solutions, Inc.*, 194 F.3d 980, 984 (9th Cir. 1999).

4           Because laches bars Roseville's trademark infringement claim, it also bars

5    Roseville's contributory trademark infringement claim against Defendants Granger,

6    Yablonka, Mak, and Siu.  With respect to Mak and Siu, the Court also concludes that no

7    reasonable jury could find that they either intentionally induced SoCal Wheels to infringe

8    any trademark or provided their services with actual or constructive knowledge of any

9    trademark infringement by SoCal Wheels.  According to the undisputed facts, SoCal

10   Wheels retained Mak and Siu to create and maintain www.socalwheels.com and to

11   maintain and update www.wheelwarehouse.com.  (Mak & Siu SGI ¶¶ 1–2.)  Mak set up

12   Google analytics for www.wheelwarehouseonline.com, and SoCal Wheels had discussions

13   with Siu regarding efforts to increase www.wheelwarehouse.com's search rankings.  (*Id.* ¶

14   252; SGI ¶ 254.)  However, Mak and Siu never had any discussions about Discounted

15   Wheel Warehouse with SoCal Wheels.  (Mak & Siu SGI ¶ 4.)  There is nothing in the facts

16   that leads to a reasonable inference that either Mak or Siu was otherwise aware of

17   Discounted Wheel Warehouse or that SoCal Wheels was infringing its trademark.

18          Therefore, the Court GRANTS Defendants' Motions as to Roseville's contributory

19   trademark infringement claim.

20

21          **D.**      **Common Law Passing Off and Disparagement**

22          Roseville's final claim is for "common law passing off and disparagement."  For

23   this claim, Roseville relies on a California Supreme Court case that states, "[t]he common

24   law tort of unfair competition is generally thought to be synonymous with the act of

25   'passing off' one's goods as those of another."  *Bank of the West v. Superior Court*, 2 Cal.

26   4th 1254, 1263 (1992).  The California Supreme Court goes on to state that this tort

27   developed "as an equitable remedy against the wrongful exploitation of trade names and

28

1    common law trademarks that were not otherwise entitled to legal protection." *Id.*  The

2    analysis for "passing off" is often substantially similar to the analysis for trademark

3    infringement.  *See Los Defensores, Inc. v. Gomez*, 223 Cal. App. 4th 377, 393–94 (2014)

4    (stating that the tort's purpose is to "prevent unfair competition through misleading or

5    deceptive use of a term exclusively identified with the claimant's product . . . whenever

6    'the name and the business . . . become synonymous in the public mind'"); *Mattel, Inc. v.*

7    *MCA Records, Inc.*, 28 F. Supp. 2d 1120, 1144 n.30 (C.D. Cal. 1998) (stating that state

8    claims for unfair competition and passing off are governed by the likelihood of confusion

9    test).  *But see Industrial Indem. Co. v. Apple Computer, Inc.*, 79 Cal. App. 4th 817, 830–31

10   (1999) (examining the two torts by referring to English law and noting that "many factors

11   are not relevant" to trademark infringement that are relevant in passing-off actions).

12        Although Defendants have failed to oppose this claim in their papers, this does not

13   automatically result in a decision in favor of Roseville.  The Court still must consider

14   whether there is "no genuine dispute as to any material fact" such that the moving party "is

15   entitled to judgment as a matter of law."  Fed. R. Civ. P. 56.  Here, Roseville's common

16   law passing off and disparagement claim appears to be based on the same conduct that

17   motivates its trademark infringement claim.  (*See* FAC ¶¶ 112–15.)  In fact, Roseville has

18   not suggested otherwise in its Opposition papers, and it even points to its arguments

19   relating to trademark infringement "to the extent that the elements of this claim are similar

20   to the . . . causes of action for federal infringement and federal unfair competition."  (*See*

21   Granger & Yablonka Opp. at 9.)  Even if trademark infringement is a "narrower tort" than

22   passing off and disparagement, "[i]t is irrelevant that the tort of passing off includes

23   elements distinct from those of trademark infringement, if none of those elements was

24   present in the circumstances of the [instant] lawsuit."  *Industrial Indem.*, 79 Cal. App. 4th

25   at 831.  In light of the application of laches to Roseville's trademark infringement claim,

26   and because Roseville provides no other basis for its passing off and disparagement claim,

27

28

1   the Court GRANTS Defendants' Motions as to Roseville's common law passing off and

2   disparagement claim.

3

4   **V.**      **CONCLUSION**

5           For the reasons stated above, the Court GRANTS Defendants' Motions for

6   Summary Judgment.

7

8

9

10  DATED: September 21, 2016

11

12

13  _____

14          JOSEPHINE L. STATON
            UNITED STATES DISTRICT JUDGE

15

16

17

18

19

20

21

22

23

24

25

26

27

28